MARC J. VICTOR, P.C.
3920 South Alma School Road, Suite 5
Chandler, Arizona  85248
(480) 455-5233
Fax (480) 755-8286
Attorneys for Defendant
**Marc J. Victor - SBN 016064**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No.  CR10-0717-001-PHX-SRB |
| Plaintiff, | ) |
| vs. | ) SENTENCING MEMORANDUM |
| HENRY OLIVER FORD, | ) |
| Defendant. | ) |

Defendant, HENRY OLIVER FORD, by and through undersigned counsel, hereby submits this Sentencing Memorandum for the purpose of providing the Court background information relevant to the upcoming sentencing hearing which is currently scheduled for December 12, 2011 at 1:00pm.

**FACTUAL BACKGROUND**

On March 8, 2011, Mr. Ford pled guilty to conspiracy to commit wire fraud.  Beginning in approximately April of 2005 until approximately June of 2007, Mr. Ford, along with his co-defendants, conspired to defraud numerous lending institutions through the purchase and resale of multiple Phoenix-area real properties.

More specifically, Mr. Ford and several of his co-defendants facilitated the purchase of several residential homes in the Phoenix metropolitan area.  Many of the homes were purchased in agreement with buyers who did not intend to occupy the homes; otherwise known as "straw buyers."

The straw buyers were paid a flat fee in an amount between $10,000 and $40,000 for the use of their credit to finance the homes in question.  Because many of the straw buyers could not financially qualify to obtain the home loans needed to purchase the homes, Vincent Vendittelli, a loan officer at Spectrum Financial Group ("SFG"), would assist, pursuant to the authorization of SFG's president, Jerry E. Craig, Sr., to falsely represent or overstate the buyer's income, assets, monthly rent and/or intention to occupy the home.  Additionally, Mr. Ford, or others working with Mr. Ford, would either deposit funds into a buyer's account or add a buyer to a preexisting bank account containing a large balance.  This was done in order to make it appear to a potential lender that the potential buyer had more assets then he actually did.

In some instances, the homes would be purchased from a third party seller at a price higher than the seller's listed price.  The seller would agree to sell the home and provide Mr. Ford and his co-defendants with the difference between the listed price and the offered price.  Mr. Ford would then pay the monthly mortgage payments on the purchased property for generally twelve to eighteen months until the property was sold for a profit.  So long as the housing market continued to rise as it had for years, there was no financial loss for any person or entity.  However, to Mr. Ford's surprise, the housing market crashed.

As the economy began to decline and the housing market crashed, Mr. Ford was no longer able to sell the homes at a profit and his income began to decrease.  Although Mr. Ford continued to make monthly mortgage payments to the best of his ability, his funds were being depleted at a rapid rate.  As his funds were depleted, Mr. Ford was unable to continue to make the monthly mortgage payments on the homes he and the straw buyers had purchased.  As a result, Mr. Ford lost all his money and many of the homes were eventually lost to foreclosure.

**CRIMINAL HISTORY**

Mr. Ford has no prior felony convictions.  However, approximately seven years ago, Mr. Ford had two arrests for domestic violence stemming from infidelity issues during a tumultuous marriage to his now ex-wife.  Mr. Ford completed domestic violence diversion classes as a result of those

arrests. Since completing those classes and ending his relationship with his ex-wife, Mr. Ford has not had any further domestic violence incidents. For the past two years, Mr. Ford has been volunteering to help victims of domestic violence and as well as volunteering at a home for a severely autistic child, Jared.

### CURRENT EMPLOYMENT

Mr. Ford is currently employed as a Sales Consultant with World Food Association in West Palm Beach, Florida. Although the company is struggling, it provides a modest income for Mr. Ford. The company seeks to import and export food and other items for underdeveloped countries. Mr. Ford and his current wife initially launched this endeavor prior to his arrest for the current charges. As someone who was raised in extreme poverty himself, Mr. Ford had hoped to grow from his experience in the mortgage industry and use the legitimate business knowledge he gained from others to have a positive impact on the less fortunate in other countries.

### FAMILY BACKGROUND

Mr. Ford is the oldest of three children who were all raised in extreme poverty in Greenville, Mississippi. Mr. Ford's biological father died when he was eight years old. Mr. Ford's step-father never fully accepted him as a son growing up. Mr. Ford often suffered extreme physical abuse at the hands of his step-father who would lock him outside in vehicles for hours and give him black eyes and fat lips. When Mr. Ford was only thirteen years old, he witnessed his step-father became angry and shot his gun at Mr. Ford's mother inside of the home. Mr. Ford's mother and step-father had two biological daughters who received the bulk of their affection, love and financial support. Needless to say, Mr. Ford was raised in extraordinarily difficult circumstances involving extreme poverty and substantial physical abuse.

### EMPLOYMENT BACKGROUND

Mr. Ford was forced to work at a young age to support his family. He was also required to purchase his own clothes and school supplies. Mr. Ford's first job was at age fourteen. During the summers he worked in the cotton fields for fifteen (15) hour days from 3:00a.m. to 6:00p.m. Then, at

3

age fifteen, Mr. Ford began working as a janitor after school.  The day Mr. Ford graduated from high school his mother informed him he would need to join the military or move out by the end summer.  Having few prospects for jobs in Greenville, Mississippi, Mr. Ford joined the United States Army.

While in the Army, Mr. Ford met and married his first wife Shannon Brown (now Shanice Denson).  After receiving a hardship discharge from the Army, Mr. Ford and his wife moved to Arizona where they lived in a two-bedroom apartment with their three children and a fourth child soon to follow.  Mr. Ford had a difficult time finding a job at first, but then began working two jobs at What-a-Burger and Pizza Hut to provide for his family.

In 1998, Mr. Ford started a job working for Quest Communications as a repairman.  While he was making a slightly more livable income, Mr. Ford and his family were still struggling.

## BACKGROUND REGARDING INVOLVEMENT IN THE CURRENT CASE

In 2002, while desperately looking for ways to better the lives of his family, Mr. Ford became aware of investment opportunities presented by skyrocketing property values in the real estate market.  Although he had no experience, sophistication or knowledge whatsoever in real estate, Mr. Ford desired to purchase small lots in Phoenix for a low price.  He dreamed of then building modest homes on those small lots and selling the homes for profit.  Although he had an idea, Mr. Ford did not have any money or credit to purchase even the small vacant lots.  Indeed, it took Mr. Ford quite some time to save enough money to eventually run an advertisement in the Arizona Republic seeking an investor and partner for his real estate dreams.

Mr. Ford's extremely difficult financial situation caused stresses and hardships for him and his then current wife.  Mr. Ford and his wife often fought about money.  Eventually Mr. Ford realized the marriage was irreparable and, in 2004, Mr. Ford and his wife separated and divorced.  Mr. Ford and Ms. Denson agreed that their three daughters would live with Ms. Denson so they could have a female influence in their life and that their son would live with Mr. Ford so he could provide a stable male influence.

In 2005, Mr. Ford was contacted by Mr. Dwayne Morris who had seen Mr. Ford's advertisement seeking real estate investors. Mr. Morris informed Mr. Ford he had $80,000 to invest. A meeting was scheduled. Mr. Morris informed Mr. Ford he didn't actually have the money, but that his friend, Mr. Marc Bordner had excellent credit and would help them buy and sell houses. Mr. Ford, Mr. Morris, and Mr. Bordner worked together to purchase homes, fix them up, and resell them at a modest profit. Mr. Ford began to obtain a simple working knowledge of real estate concepts.

In March of 2006, while working with Mr. Morris and Mr. Bordner, Mr. Ford was introduced to a company called Cut N Deals ("Deals.") Deals represented that they worked with lenders, such as Spectrum Financial Group ("SFG") to purchase homes and receive cash back at closing. Mr. Ford, who was entirely unsophisticated in real estate matters, was completely unfamiliar with the concepts presented by Deals and SFG. Mr. Ford stood in awe as he was educated about the real estate market, closings, financing, cash back options and other real estate concepts.

Mr. Ford received an education during his meetings with the people involved with Deals. Mr. Ford was indeed in over his head as he was amazed by the new concepts he was taught. At that time, Mr. Ford simply accepted, without question, everything he was told by the people involved with Deals. Indeed, the fact that Deals was heavily involved in an ongoing business relationship with the well established SFG, lent credibility to the things said by the people involved with Deals. Mr. Ford believed everything he was told. Mr. Ford was educated and convinced that instead of waiting to receive money after fixing up homes and re-selling them as he previously had done, he could receive money at the initial closing of the home. Additionally, Mr. Ford was informed he could make much more money in a shorter period of time. Mr. Ford was specifically informed that all activities engaged in by Deals were entirely legal. At that time, Mr. Ford indeed believed he was becoming involved in entirely legal activity.

Mr. Ford, Mr. Morris, and Mr. Bordner were requested to find people who would allow the use of their personal credit to fund the purchase of homes. Mr. Morris suggested that the people from Mr. Bordner's church all had excellent credit and could be recruited to purchase homes through

Deals. At the time, Mr. Ford believed this was an excellent opportunity and a solid investment for the straw buyers and everyone else involved in the transaction. Indeed, Mr. Ford had now been witness to several successful such transactions orchestrated by Deals.

In April, 2006, while Mr. Ford was on the verge of embarking on his business dealings with Deals, he met his current wife, Cicely Jordan Ford. At that time, Mr. Ford was still struggling financially such that he needed to borrow rent money from Cicely. Mr. Ford was enticed by Deals and the idea of finally being financially independent and stable for the first time in his life. Mr. Ford decided to get involved with Deals, and pursue what he believed would be a harmless endeavor that would be profitable for all involved.

As Mr. Ford began to better understand the business he was now involved in, he began to question the legality of the real estate scheme he had joined. Eventually, Mr. Ford learned of falsely inflated appraisals, violated real estate transaction requirements and other lending issues which caused Mr. Ford to believe he was presently involved in an illegal scheme. Nonetheless, Mr. Ford still believed nobody would be victimized at any point. In any event, Mr. Ford was entirely unable to withdraw at that time without defaulting on several mortgages he was then committed to pay. Mr. Ford had several properties tied to straw buyers who were depending on Mr. Ford to make the required monthly mortgage payments. Mr. Ford found himself caught in a Catch 22. To continue with the scheme would mean knowingly furthering an illegal mortgage scheme, but to stop would certainly result in foreclosure of all properties. Indeed, to stop would most certainly result in the straw buyers and lenders suffering economic loss and becoming victims. Mr. Ford did not desire to see the straw buyers suffer economic loss as many of them were simply people of modest means who, like Mr. Ford, were simply trying to financially benefit from the rising real estate market. Therefore, Mr. Ford opted to continue with the scheme so he could successfully complete all his transactions and sell all the properties for a market price thereby avoiding losses to everyone involved. Moreover, Mr. Ford, for the first time in his life, was finally able to financially support himself and his children.

Because Mr. Ford had, at all times, every intention of paying off all the mortgage loans made through his company, Rashad Dollar Company, he saw no actual harm in continuing and no viable option to withdraw.  So long as the real estate market continued to rise, there were no losses.

However, when the real estate market crashed in 2007, Mr. Ford found himself with mortgage home loans through straw-buyers he was unable to pay, and homes he was unable to sell.  Had Mr. Ford not cared about either the straw buyers or the lenders involved, he could have simply taken the funds he had accumulated at that time and left everyone to fend for themselves.  He didn't.

Rather than take his profits and run, Mr. Ford continued to use his then accumulated profits to continue to pay the monthly mortgages on all properties until his money ran out and he could no longer pay the mortgages.  Mr. Ford kept hoping the market would turn around and he would be able to continue to pay the mortgages and eventually sell the homes.  However, when the real estate market continued to fall, Mr. Ford had no choice but to allow the homes to foreclose.  Mr. Ford never had any intention of causing a financial loss to anyone.  He did everything within his power to avoid foreclosures and financial losses to any party.  Indeed, just before Mr. Ford completely exhausted all his funds, he conveyed approximately One Hundred Eighty Thousand Dollars ($180,000.00) to Mr. Jerry Craig Sr. for the purpose of refinancing the straw buyers' mortgages to remove the straw buyers from those mortgages.  However, apparently Mr. Jerry Craig Sr. failed to follow through on his promise to Mr. Ford and instead used those funds for other purposes and declared bankruptcy.  Although Mr. Ford is certainly guilty of engaging in an illegal mortgage scheme, until the end, he sincerely believed there would be no loss to any person or entity.

## **CHARACTER**

After the mortgage crash, Mr. Ford attempted to move forward with his life and make a positive difference in the lives of others.  It was with this thought in mind that Mr. Ford began his work with World Food Association.  As the character letters demonstrate, Mr. Ford is indeed sincere in his desire to help others.  He has not simply discovered this concept because he is scheduled for sentencing.  Long before this case, Mr. Ford had a sincere and burning desire to do good things in the

world and to assist others. As those who know Mr. Ford best explain, it is substantially out of Mr. Ford's character to take advantage of others for personal gain. Since his arrest, Mr. Ford has dedicated his time to helping others less fortunate.

Attached are letters from:

1) ***Cicely Jordan Ford***, Mr. Ford's wife, who details the support she receives from her husband, and how he has positively impacted her life as well as the support and love he provides for his children. She also describes the humanitarian work Mr. Ford desires to accomplish through World Food Association. Cicely also expresses the extreme remorse Mr. Ford feels for his actions and how it has affected him.

2) ***Dianne Ford Wilson***, Mr. Ford's mother, details her son's church involvement growing up and desire to help others. She explains how Mr. Ford has expressed regret for his mistakes and is striving to redeem himself.

3) ***Shanice Denson***, Mr. Ford's first wife, Describes Mr. Ford as an amazing father. She explains how Mr. Ford has always been there for his children, even for the smallest events. She describes how Mr. Ford wants nothing more than to continue to be available for his children for their upcoming events. She describes how Mr. Ford strives to teach his children right from wrong and how not having their father available will be detrimental to them.

4) ***Francis Attah Prah***, Mr. Ford's friend, writes that Mr. Ford has been a comfort and inspiration to him. He states Mr. Ford is a personification of a Good Samaritan and takes responsibility for his actions.

## PRETRIAL RELEASE

To undersigned counsel's knowledge, Mr. Ford was the only person involved in this case who was detained pending trial unless a substantial bond was posted. Indeed, Mr. Ford was initially detained pending the execution of a $500,000 bond. That bond was eventually lowered to $250,000 and Mr. Ford was bonded out of jail by Better Bail Bonds. He has complied with all release

requirements, including home arrest and an ankle bracelet, imposed on him by either this Court or Better Bail Bonds. On several occasions during the pendency of this matter, Mr. Ford applied for permission to travel to various places throughout the nation. In each case, Mr. Ford scrupulously complied with all release conditions; even while his current ankle bracelet was removed during his travels. Mr. Ford did well while on release. Mr. Ford has cooperated completely with his attorneys as well as the government and has appeared at all required court appearances.

## FINANCIAL LOSS

Mr. Ford does not seek to minimize his actions. He is remorseful and accepts full responsibility for what he has done. That said, undersigned counsel requests that this Court consider the economy in which this crime occurred. Mr. Ford acknowledges he is responsible for the losses sustained by the lenders involved. However, Mr. Ford is not responsible for the sharp and unforeseen decline in the housing market. Indeed, Arizona was among the worst areas affected by the sharp decline. While the housing market crash does not excuse Mr. Ford's actions, it does, by itself and independent of Mr. Ford's actions, account for a large amount of the loss incurred by the lenders.

As this Court is aware, the Federal Sentencing Guidelines put a substantial emphasis on the monetary loss caused by the defendant in determining a sentence. However, "[t]he guidelines do not present a single universal method for loss calculation under § 2B1.1-nor could they, given the fact-intensive and individualized nature of the inquiry." *United States v. Zolp,* 479 F.3d 715, 718 (9th Cir.2007). For this reason, federal courts are charged with taking a "realistic, economic approach to determine what losses the defendant truly caused or intended to cause, rather than the use of some approach which does not reflect the monetary loss.' " *United States v. Stoddard,* 150 F.3d 1140, 1145-46 (9th Cir.1998) (quoting *United States v. Allison,* 86 F.3d 940, 943 (9th Cir.1996)).

As such, this Court should evaluate what loss, if any, was intended by Mr. Ford. Here, Mr. Ford did not intend any loss whatsoever to any victim. Although he was mistaken, Mr. Ford believed the housing market would continue to rise as it had for many years prior to Mr. Ford's involvement. Had the housing market continued to rise, there is a high likelihood no person or entity would have

suffered any financial loss as a result of anything Mr. Ford did.  Mr. Ford simply intended to continue to buy and sell homes as the housing market continued to rise.  At some point, Mr. Ford could have simply sold each home at the then current market price to a buyer who intended to live in the home for several years.  Even that legitimate buyer would likely have realized financial gain when they finally sold the home.  That the housing market did not behave as it did for several years prior or as Mr. Ford believed it would behave does not change the fact that Mr. Ford intended no loss to any person or entity.  Similarly, that people and entities suffered economic loss is not evidence that Mr. Ford intended any loss.  Simply put, there is no evidence to support an assertion that Mr. Ford intended any loss and much evidence, including Mr. Ford's actions of depleting his funds to pay mortgages, to the contrary.

Because there was no intended loss, this Court should then analyze the actual loss.  Actual loss is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 cmt. n. 2(A)(i.)  Moreover, reasonably foreseeable pecuniary harm is "pecuniary harm that the defendant knew, or under the circumstances, reasonably should have known, was a potential result of the offense." *Id.* cmt. n. 2(A)(iv); U.S. v Crandall 525 F.3d 907, 914-915.

Countless seasoned and highly experienced real estate investors, speculators and builders were caught completely off guard by the sharp decline in the housing market.  Mr. Ford was generally unsophisticated in real estate matters.  However, even had Mr. Ford been a highly experienced real estate mogul, he would nonetheless have been as incapable as anyone else of knowing or expecting the housing market would crash as severely as it did.  Nor is it reasonable to say Mr. Ford, or anyone else, should have known of the impending real estate market crash.

Undersigned counsel concedes Mr. Ford is responsible for some economic loss.  However, this Court should consider and weigh heavily Mr. Ford's intent that no loss would occur as well as the unforeseen sharp market decline.  As such, this Court should afford Mr. Ford leniency in sentencing based on the fact that whatever loss numbers are used, they may very well seriously overstate the degree of culpability as applied to Mr. Ford in this case.  Mr. Ford should be held

accountable for his actions, but his relatively harmless *mens rea* and unforeseen market conditions should not be ignored. Mr. Ford should not suffer because of changes in the market. *Id*.

### §5K1.1

The mortgage scheme at issue involved many people. Because Mr. Ford became personally acquainted with many of the people involved, the Government became interested in talking to Mr. Ford. Mr. Ford eventually entered into a Cooperation Agreement with the Government whereby he remains available to testify against Jerry E. Craig, Sr. and Jerry E. Craig, Jr. in court. It is expected that in the future, if guilty pleas are entered on behalf of Jerry E. Craig, Sr. and Jerry E. Craig, Jr. it will be partially because of Mr. Ford's anticipated testimony.

In evaluating the five factors regarding a §5K1.1 reduction, it is clear Mr. Ford is entitled to a substantial reduction for his assistance to the Government:

The first factor to consider is the significance and usefulness of Mr. Ford's assistance. U.S.S.G. § 5K1.1(a)(1). The information provided to the Government by Mr. Ford has lead to the indictments of Jerry E. Craig, Sr. and Jerry E. Craig, Jr., who were the instigators behind the conspiracy and the owners of SFG, which funded most of the loans in this case. Should the Craigs enter into guilty pleas, it cannot be denied that it will be partially because of Mr. Ford's anticipated testimony against the Craigs.

The second and third factors address the truthfulness, completeness, and reliability of the information provided by Mr. Ford as well as the nature and extent of Mr. Ford's assistance. U.S.S.G. §§ 5K1.1(a)(2)&(3). Mr. Ford has made complete disclosure of all the information he possesses to the Government. On three separate occasions, Mr. Ford sat for hours with attorneys and investigators for the Government and explained in detail everything he knew about those who were indicted and others who were yet to be indicted. Mr. Ford provided helpful e-mails and documentation detailing the nuances of how the scheme was implemented and the people involved. Mr. Ford thoroughly answered many questions put to him by attorneys and investigators on behalf of the Government. Mr. Ford compiled a detailed binder with over two-hundred pages of helpful information which he

voluntarily provided to the Government during one of the free talks. Additionally, Should the Craigs go to trial, Mr. Ford is prepared and willing to testify on the Government's behalf.

The fourth factor considers any injury suffered or any danger or risk of injury to Mr. Ford or his family as a result of his assistance. U.S.S.G. §5K1.1(a)(4). As of this date Mr. Ford has not suffered any injury as a result of his assistance. However, counsel for the Government specifically requested that Mr. Ford not seek to seal his plea agreement as is often done in such situations. Mr. Ford graciously and courageously agreed to that request so the Government could freely disclose his Cooperation Plea Agreement at its discretion. Mr. Ford agreed to that request knowing full well his plea agreement allows for prison time. As this Court is aware, given that Mr. Ford's plea agreement is freely available, he is at grave risk of injury from others should he be incarcerated. Not only would Mr. Ford be at risk from any person involved in this case, but he would be at grave risk from virtually anyone in the prison system. It is well known that cooperators get beaten and even sometimes murdered due to the mere fact that they cooperated. Mr. Ford is in grave risk of danger from any incarceration time.

The final factor for consideration is the timeliness of Mr. Ford's assistance. U.S.S.G. §5K1.1(a)(5). Mr. Ford had been willing to cooperate with the Government from the moment he understood the charges against him. While it is true that Mr. Ford was advised to fight extradition from New York, he did so because he was not advised about the charges. Indeed, Mr. Ford was unaware of the investigation until he was taken into custody in New York. Mr. Ford was advised by an attorney in New York to stay in New York so he could conduct a probable cause hearing. At no time was Mr. Ford attempting to evade prosecution. Mr. Ford was merely following the advice of his attorney at the time. Mr. Ford was unaware of the extent of the charges against him and had never been involved in the federal justice system and had no understanding of how it worked.

Shortly after undersigned counsel advised Mr. Ford about the case, Mr. Ford immediately agreed to participate in a freetalk and has been available ever since for additional assistance. Mr. Ford made full and complete disclosure to the Government of all the information he possessed

regarding this scheme and its players. Mr. Ford has complied meticulously with the terms of his release and has made every effort to cooperate with the Government throughout this time. The information received by the Government from Mr. Ford has been instrumental in the indictment of the two key players, Jerry E. Craig, Sr. and Jerry E. Craig, Jr. Given Mr. Ford's substantial assistance to the Government in this case, Mr. Ford has earned a substantial downward departure to reflect the extent of his cooperation and assistance to the Government.

Mr. Ford admits and realizes what he did was wrong. He feels a responsibility to do all he can to assist the government bring all involved to justice. As such, Mr. Ford has taken responsibility for his actions and has greatly assisted the government in their prosecution of this offense and the now expanded investigation. It is expected the Government will file a Motion pursuant to U.S.S.G. § 5K1.1 for a downward departure to recognize Mr. Ford's cooperation in this matter. As such, justice requires that Mr. Ford receive a substantial reduction of his sentence because of his substantial and repeated cooperation in this matter.

### §3553

In determining sentencing for Mr. Ford "the Court shall impose a sentence sufficient, *but not greater than necessary*, to comply with the purposes set forth in [18 U.S.C. §3553(a)(2)]." 18 U.S.C. §3533(a). A significant departure from the Federal Sentencing Guidelines is warranted given the circumstances surrounding Mr. Ford's offense as well as the facts surrounding Mr. Ford's background and upbringing. Mr. Ford is not a repeat offender. The facts and circumstances of this case allow for a conclusion that it is unlikely Mr. Ford will reoffend in the future. As such, there is no need to impose a sentence to protect the public from further crimes. Additionally, Mr. Ford has already, prior to being indicted, taken steps to rehabilitate himself and turn his life around, as is evident through his work with World Food Association.

18 U.S.C. §3553(b) allows the Court to consider the extraordinary circumstances of Mr. Ford's offense in determining his sentence and deviate from the Federal Sentencing Guidelines. It is clear, that the circumstances surrounding the loss amount constitute mitigating circumstances that

could not have been adequately taken into consideration by the Sentencing Commission in formulating the guidelines. The factors surrounding the loss speak to the "culpability of [Mr. Ford] and the severity of the offense" and therefore constitute "a permissible basis for departure." *United States v Crippen*, 961 F.2d 882, 884 (9th Cir. 1992). The facts clearly show Mr. Ford did not intend to cause a loss to anyone. Indeed, Mr. Ford did everything in his power to avoid a financial loss to any person or entity. However, the unforeseen housing market crash made it impossible for Mr. Ford to avoid financial losses.

Additionally, this Court should consider and weigh heavily Mr. Ford's childhood in concluding a downward departure is warranted. Similarly to the defendant in *United States v Floyd*, 945 F.2d 1096 (9th Cir. 1991), Mr. Ford suffered from a "youthful lack of guidance." Mr. Ford grew up in extreme poverty and his mother and step-father expended the majority of their time and resources between his half siblings leaving Mr. Ford to fend for himself. Mr. Ford was required to pay his own way and assist in supporting his family while suffering ugly physical abuse at the hands of his step-father. Mr. Ford developed a need to survive attitude towards life that drove him to seek out opportunities to improve his financial situation so his children would not grow up as he did. As a result, Mr. Ford could not resist the opportunity he was presented with by Deals which finally appeared to promise him the financial freedom he had longed for his entire life.

In determining the appropriate sentence to impose, the Court will undoubtedly consider the codefendants and assess various levels of culpability to ensure that co-defendants are punished with their appropriate level of culpability in mind. Counsel for the Government is expected to equate Mr. Ford's level of culpability with Mr. Chrzanowski's level of culpability. However, upon close examination, it is clear Mr. Ford is substantially less culpable than Mr. Chrzanowski. Based on the information known to undersigned counsel, there are significant differences between Mr. Ford and Mr. Chrzanowski:

1. Mr. Chrzanowski entered the mortgage scheme as a former licensed loan officer, experienced real estate investor and licensed real estate agent with extensive knowledge and experience in the mortgage industry while Mr. Ford had no knowledge or experience and was entirely unsophisticated in real estate or financial matters.

2. Mr. Chrzanowski, along with Mr. Venditelli, knew and had existing and ongoing business relationships with the various escrow agents, appraisers and title agents involved in the mortgage scheme. Such relationships existed long before Mr. Ford became involved in the mortgage scheme. Mr. Ford knew no such people and had no such business relationships.

3. Mr. Chrzanowski was personally involved in mortgage schemes for approximately forty-five (45) homes. In sharp contrast, Mr. Ford was involved with merely nine (9) homes.

4. Mr. Chrzanowski personally knew, met and persuaded many, if not all, of his "straw buyers" to qualify for homes. Mr. Ford did not personally persuade any "straw buyers" to qualify for homes and only briefly met two "straw buyers" involved with properties attributed to him.

5. Mr. Chrzanowski became involved in the mortgage scheme in 2005. Mr. Ford did not become involved until 2006.

6. Mr. Chrzanowski remained in the mortgage scheme, working along with Mr. Venditelli, until 2009 while Mr. Ford's involvement ended in February 2007. As such, Mr. Chrzanowski and Mr. Venditelli worked together on mortgage transactions for approximately forty-five (45) months while Mr. Ford was involved approximately eleven (11) months; much of that time Mr. Ford believed he was involved in legal transactions.

7. Mr. Chrzanowski personally applied for home mortgages involved in the mortgage scheme. Mr. Ford never personally applied for any home mortgage loans.

8. Mr. Chrzanowski apparently decided to become a fugitive of justice after he learned of the investigation, but obtained a release on his recognizance which he maintained throughout this matter. Mr. Ford spent almost five (5) months in jail until his $500,000 bond was posted. After he was released from jail, Mr. Ford spent approximately two (2) months living confined in a trailer at the facility owned by his bondsman. He then spent approximately fourteen (14) months on home arrest wearing an ankle bracelet; all without any violations of his release conditions. The more culpable Mr. Chrzanowski never endured any such treatment.

9. While it is true Mr. Ford, along with Mr. Bordner, formed a business entity named "Rashad Dollar Company" to administer the nine (9) home mortgage loans, Mr. Chrzanowski also formed, operated and managed business entities named, "Nationwide Homesolutions, Inc." and "Homesolutions Management Group" as early as 2004; before

Mr. Ford was involved in the mortgage scheme. As such, Mr. Ford was no more a manager or leader than Mr. Chrzanowski as to their own business entities.

Given their relative levels of knowledge, sophistication, length of involvement and overall participation in the mortgage fraud scheme, Mr. Ford is clearly substantially less culpable than is Mr. Chrzanowski and, in the interest of justice should receive a substantially lesser sentence. Additionally, the facts and circumstances of both Mr. Ford's involvement in this case as well as the extreme circumstances surrounding Mr. Ford's upbringing warrant a variance from the sentencing guidelines as these are circumstances not adequately taken into consideration by such guidelines.

## **DISCUSSION**

As this Court is well aware, some people commit crimes because they simply do not care about the rights of other people. Others commit crimes for reasons of bad judgment. Mr. Ford is certainly in the latter group. Had Mr. Ford been a person who was unconcerned about the rights of others, he would likely have accumulated a substantial criminal history by this point in his life. Mr. Ford has led a generally law abiding life. Like everyone else, he sought to make a better life for himself and his family. Unlike many others, Mr. Ford began life with several horrible disadvantages including severe poverty and ugly physical abuse. It has been an extraordinarily difficult and long struggle for Mr. Ford to get himself in a position where he had a shot to make a better life for himself and his family. Mr. Ford had every reason to view events with rose colored glasses as he so badly wanted to take advantage of what he believed at the time was his only opportunity for a better life. He undoubtedly made bad choices; criminal ones.

However, Mr. Ford was far from the mastermind in this mortgage scheme. At all times, Mr. Ford was a highly inexperienced and unsophisticated real estate novice. He never sought to defraud any lenders or borrowers nor did he retain any money as a result of this scheme. He gained nothing. Although he could easily have taken the money and run away, he stayed and tried to make things right.

16

It is easy to understand why Mr. Ford was initially lured into believing the ongoing business of Deals buying and selling homes was perfectly legal when one considers that Mr. Ford was witness to successful people in established companies like SFG and Deals conducting ongoing transactions. At the time Mr. Ford was introduced to the scheme, Deals had been long conducting real estate sales with SFG. Mr. Ford had nothing to do with originating, designing, implementing or managing the ongoing mortgage scheme. Mr. Ford was initially given the impression that all that was happening was that both the seller and the buyer were getting cash back at the end of closing, something that, because it was disclosed to the lender, was entirely legal. Mr. Ford was taught and encouraged to use his little company Rashad Dollar to simply assist and carry on with the ongoing long pre-established mortgage scheme. Rashad Dollar was but one minor player in this much larger mortgage scheme.

Mr. Ford was tempted and lured into this scheme by the much more sophisticated Jerry Craig, Sr. and Vincent Vendittelli. Mr. Ford initially concluded he fell into the break of his life. Soon thereafter, Mr. Ford admits he ignored warning signs and his inner voice, which told him this endeavor was not legal. To his detriment, he continued nonetheless. However, the recently indicted Jerry Craig, Sr. took advantage of Mr. Ford's desire to improve his life and his family's life and encouraged him to find straw buyers while assuring him the plan was a safe investment and no one would be hurt in the process. They lied to Mr. Ford and he believed it; even when he finally had evidence to the contrary.

Since his arrest, Mr. Ford has suffered badly. In his letter to the Court, Mr. Ford details the several ways he has suffered throughout this ordeal. Mr. Ford now realizes how much harm can come from the desire to make quick and easy money. As is also clear from his letter, he deeply regrets his actions.

There is no doubt Mr. Ford is entitled to be punished. However, this Court undoubtedly has extremely wide discretion in this case. Mr. Ford is now a convicted felon for the rest of his life. For all practical purposes, he has made it much more difficult for himself to ever realize his lifelong dream to substantially better his life. Mr. Ford has already served four very difficult months of

incarceration which placed an extreme strain on his family and marriage.  He is currently again living in extreme poverty and has been for the past many months.  All his family relationships are highly strained.  Mr. Ford has lost much sleep as a result of the guilt he feels for the people he hurt.

As he has pointed out in his letter to the Court, Mr. Ford still seeks to help others.  Indeed, he has dedicated his life to helping others in Africa and Brazil have food and clean water and many of the everyday necessities taken for granted by others.

Undersigned counsel ponders what purpose, given the extreme and extraordinary circumstances of this case, additional incarceration would serve.  Mr. Ford has been punished for his role in the offense.  Had Mr. Ford truly been a ring leader or organizer of the mortgage scheme in question, there would be a clear case for additional incarceration.  Mr. Ford was, in reality, closer to a pawn than to an organizer.  Although he was indeed a manager and supervisor of Rashad Dollar, that company was like a drop of water in the ocean when compared to the involvement of Deals and SFG in this scheme.  Mr. Ford knew virtually nothing about real estate until he was educated by others.  He is a man who had to save money to run an advertisement in the newspaper seeking investors to finance modest properties.  At no time did Mr. Ford intend or expect any losses to anyone.

Whatever deterrent effect is needed or can be gained by further incarceration is likely already realized.  Mr. Ford, who has done well since his release, is not likely in need of whatever rehabilitation can be accomplished by additional incarceration.

Given that Mr. Ford is now publicly a cooperator who indeed provided helpful information to the Government during three free talks resulting in assistance to the Government in obtaining a major indictment, Mr. Ford's life would be in serious danger from any further incarceration.  In addition, Mr. Ford has earned a downward departure for his assistance.  Whatever argument remains for additional incarceration is outweighed by the danger posed to Mr. Ford and the benefit that Mr. Ford should receive as a result of his substantial assistance.

Therefore, undersigned counsel respectfully requests that this Court consider all the § 3553 factors contained in this Sentencing Memorandum as well as the §5K.1 departure and sentence Mr.

1  Ford to time served.  In the event this Court orders additional incarceration for Mr. Ford, he
2  respectfully requests at least thirty (30) days to self surrender.
3
4              Respectfully submitted this 5th day of December 2011.
5                                                    MARC J. VICTOR, P.C.
6
7                                                    /s/ Marc J. Victor
                                                     Marc J. Victor
                                                     Attorney for Defendant
8
9  Copy of the foregoing transmitted,
   By CM/ECF for filing this 5th day
10 of December 2011 to:
11 Clerk's Office
   United States District Court
12 Sandra Day O'Connor Courthouse
13 401 W. Washington
   Phoenix, Arizona  85003
14
   Copy Delivered to:
15
   Honorable Susan R. Bolton
16 U.S. District Court Judge
17 401 W. Washington
   Suite 522
18 Phoenix, Arizona  85003
19 Kevin R. Rapp, Esq.
   Assistant U.S. Attorney
20 Two Renaissance Square
21 40 N. Central Ave. Suite 1200
   Phoenix, Arizona 85004-4408
22
   Mark W. Nebgen
23 U.S. Probation Officer
   Sandra Day O'Connor Courthouse
24 401 W. Washington, Suite 160
   Phoenix, Arizona  85003
25
   /s/ Kathy Clements